UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

JENNIFER CRESPO, AMY CRESPO, MAYRA
CRESPO, and ANGEL CRESPO,

                              Plaintiffs,

            -against-

THE CITY OF NEW YORK; NYPD POLICE
OFFICER LAUREN BOVE; NYPD POLICE
OFFICER JOSEPH IERACI; NYPD POLICE
OFFICER ZACHARY CULLEN; NYPD POLICE
OFFICER ANGELO PIROZZI; NYPD POLICE
OFFICER DOES 1, 2, 3, ETC. JOHN AND/OR JANE;
and NEW YORK CITY POLICE DEPARTMENT,

                            Defendants.

------------------------------------------------------------------ X

**MEMORANDUM
DECISION AND ORDER**

22-cv-2693 (BMC)

**COGAN**, District Judge.

     This case arises from a reported incident of domestic abuse.  Plaintiffs are the victim, the abuser, and their two daughters.  The individual defendants are police officers who responded to the report, entered plaintiffs' home, arrested the abuser, and then arrested both daughters, who attempted to interfere with the first arrest.  Plaintiffs brought federal and state constitutional claims against the officers and the City.  The parties have filed cross-motions for summary judgment.

     For the following reasons, defendants' motion is granted in part, and the case is dismissed.  The individual defendants are shielded from plaintiffs' federal unlawful-entry claim by qualified immunity because they were at least reasonable in concluding that the emergency-aid exception to the warrant requirement applied.  The other federal claims fail as a matter of

law, and the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## BACKGROUND

The relevant events are effectively undisputed.  The parties' Rule 56.1 statements tell essentially the same story, which is confirmed by the officers' body-cam footage.  Although plaintiffs purport to dispute various "characterizations" of the footage in defendant's Rule 56.1 statement, the videos clearly show what is described below, and no reasonable jury could find otherwise.  Cf. Scott v. Harris, 550 U.S. 372, 378-81 (2007) (when a party's version of the facts is discredited by a video recording, a court should accept the video recording on a summary judgment motion).

On the day in question, plaintiff Mayra Crespo called 911 and reported that her husband, plaintiff Angel Crespo, had punched her and dragged her across the floor of their home. Although Mayra initially told the operator that Angel had left the house, she called back roughly thirty minutes later to report that he had returned.  NYPD officers Lauren Bove, Joseph Ieraci, Zachary Cullen, and Angelo Pirozzi (collectively, the "individual defendants") arrived at the Crespos' home shortly after Mayra made her second call.

Upon arrival, they met Mayra and her daughter, plaintiff Jennifer Crespo, on the front porch.  Mayra, who the bodycams show was visibly swollen and bruised, told Officer Bove that Angel had punched her in the face and shoulder, and she warned the officers that Angel was still in the house.  Mayra also recounted that Angel had hit her at least once before the incident that day, and that on another occasion, after she told Angel that she wanted a separation, Angel had threatened to kill himself if she went through with it.

When the responding officers asked to enter the home to arrest Angel, Mayra advised them that she did not want her husband arrested. Instead, she pleaded, "she just wanted to be protected" from him. The officers responded by explaining that they could not protect her without arresting him. At this point, Angel came out onto the porch. He denied hitting Mayra, claimed he had just pushed her around (despite her obvious facial and body bruises), and refused the officers' request to produce identification before ultimately retreating inside the house. After more discussion with Mayra and then amongst themselves, the officers advised Mayra that they were going to arrest Angel. They entered the house along with her to do so, although she did not consent to the entry.

The situation soon deteriorated. Angel refused the officers' repeated directions to face the wall so they could arrest him. He balled up his fists, said "let's go for it," and began violently swinging his arms. Two officers attempted to handcuff him, but they were unsuccessful. All the while, Mayra, Jennifer, and plaintiff Amy Crespo – Angel and Mayra's other daughter – repeatedly interposed themselves between the officers and Angel. They tried to pull Angel away from the officers and tried to block the officers' access to him.

It was at this point that Officer Bove deployed her taser, set to "stun mode," on Angel, but Angel was unaffected. Mayra then tried to wrestle the taser away. Finally, Bove was able to tase Angel, and the officers were able to secure the arrest. The individual defendants directed other officers who arrived as backup to arrest Jennifer and Amy as well. The two daughters were transported to the precinct and charged with resisting arrest and obstruction of governmental administration ("OGA"). Jennifer received an adjournment in contemplation of dismissal. Amy was placed on probation.

Plaintiffs then brought this suit.  The amended complaint asserts six constitutional claims under 42 U.S.C. § 1983 against the individual defendants: (1) unlawful entry and seizure; (2) false arrest; (3) excessive force; (4) malicious prosecution; (5) denial of a fair trial through fabrication of evidence; and (6) failure to intervene.  It also sets forth analogous state claims against the City of New York and the NYPD (collectively, the "City") under a theory of *respondeat superior* and against the individual defendants directly.

**DISCUSSION**

I.    **Federal Claims**

To prevail on their § 1983 claims against only the individual defendants, plaintiffs must clear a familiar hurdle: qualified immunity.  A state official is entitled to qualified immunity unless "(1) . . . [they] violated a statutory or constitutional right, and (2) . . . the right was clearly established at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (quotation omitted).  Courts may perform this two-step inquiry in any order, but the Supreme Court has encouraged lower courts to "promote[] the development of constitutional precedent" by considering each step in turn.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).   I accept that invitation, although I reach the second step on only the unlawful-entry claim.

A.    Unlawful Entry

**Constitutional Violation.**  "[T]he Fourth Amendment has drawn a firm line at the entrance to the house." Payton v. New York, 445 U.S. 573, 590 (1980).  For that reason, warrantless entry into a suspect's home presumptively violates the Fourth Amendment.  See Welsh v. Wisconsin, 466 U.S. 740, 749 (1984).  "[A]n officer is, absent exigent circumstances, required . . . to secure the substantive due process rights of domestic violence victims through legal means such as by obtaining consent or a warrant to enter a home." Penree ex rel. Penree v.

4

City of Utica, 694 F. App'x 30, 32 (2d Cir. 2017), aff'g, No. 13-cv-1323, 2016 WL 915252 (N.D.N.Y. March 4, 2016).

Defendants acknowledge that because they lacked a warrant and did not secure plaintiffs' consent, they must show that "exigent circumstances" justified their entry. The exigency on which they rely is the so-called "emergency aid doctrine," applicable when "law enforcement agents were confronted by an urgent need to render aid" inside a home. United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990) (en banc). Whether such an urgent need existed "turns on [an] . . . examination of the totality of the circumstances confronting law enforcement agents in the particular case." Id. The "core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action." Chamberlain ex rel. Chamberlain v. City of White Plains, 960 F.3d 100, 106 (2d Cir. 2020).

The Second Circuit has identified six non-exhaustive factors for courts to consider in determining whether emergency-aid exception to the warrant requirement applies:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

MacDonald, at 916 F.2d 769-70 (cleaned up). It has also urged courts applying these factors to carefully consider "the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." Tierney v. Davidson, 133 F.3d 189, 196-97 (2d Cir. 1998) (quoting 3 Wayne LaFave, Search and Seizure § 6.6(a), at 391 (3rd ed. 1996)). Moreover, "the combustible nature of domestic disputes" requires that courts "accord[] great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when

5

the officer had substantial reason to believe that one of the parties to the dispute was in danger." Id. at 197 (citations omitted).  Still, warrantless entry is unconstitutional when "there [is] no emergency," even if officers have probable cause to suspect that a domestic dispute occurred. See Penree, 694 F. App'x at 33.

It should be no surprise that an ongoing domestic dispute can justify a warrantless entry under this framework.  In Tierney, for instance, an officer responded to a call reporting sounds of violence coming from inside a house, and when he arrived, neighbors told him that similar incidents had occurred in the past, that the current altercation was "the worst yet," and that they heard screaming and banging which ceased upon the officer's arrival.  133 F.3d at 192-94.  The officer was able to enter the house through a broken windowpane and observed the plaintiff, red-faced and shaken, standing with her children at the bottom of some stairs, at which point she told the officer that everything was alright and that he should leave.  As the officer attempted to enter the children's bedroom, the plaintiff blocked him, but he was able to enter anyway.  Reversing the district court's grant of summary judgement to the plaintiff, the Second Circuit held that exigent circumstances excused the warrantless entry as a matter of qualified immunity:

> [I]t was reasonable for [Officer] Davidson to believe that the search was justified by exigent circumstances. Davidson had been trained to treat these calls as "priority" and to expect violence in many such disputes. He was responding to what he was told was a "bad" domestic disturbance, the worst yet at this location according to experienced observers; when he arrived at the scene, he was informed by neighbors that the shouting had ended right before his arrival; and as he approached the house, Davidson heard nothing and found a broken window pane. It was reasonable for Davidson to believe that someone inside had been injured or was in danger, that both antagonists remained in the house, and that this situation satisfied the exigent circumstances exception.

Id. at 197.

On the other end of the spectrum, in Loria v. Gorman, 306 F.3d 1271 (2d Cir. 2002), the Circuit held that the MacDonald factors did not justify an officer's warrantless entry into a home.

6

There, police had responded twice to noise complaints about a house party. The second time, the homeowner refused an officer's request to come to the door to discuss the problem and attempted to close the open door in the officer's face, but the officer pushed his way in, hitting the homeowner in the face with the door and knocking him to the ground. The officer arrested and charged the homeowner with OGA, and the homeowner eventually sued the officer for unlawful entry.

The most important consideration for the Court in finding a lack of exigent circumstances was the first MacDonald factor – the lack of "gravity or violent nature of the offense." It noted that OGA is a Class A misdemeanor punishable by no more than one year of incarceration. And the underlying offense that the police were attempting to investigate – a city noise ordinance for which the maximum penalty was a $25 fine – was extremely minor. "It would be hard to justify a holding that attempting to close a door in order to impede an investigation into an offense punishable by only a small fine constitutes a 'grave or violent' offense, even if the obstruction itself is theoretically jailable." Id. at 1285.

Nor did the other factors weigh strongly in favor of exigent circumstances. Although probable cause existed for an arrest and the police had reason to believe the plaintiff was inside his home, the minor nature of the crime made those factors less important for purposes of assessing exigent circumstances. Moreover, the Court held, there was no suggestion that weapons were present; the officers' entry was not "peaceful" as they had to force the door open and injured the homeowner in the process; and there was nothing to suggest an "escape" was likely. The Court therefore found as a matter of law that exigent circumstances were not present.

Under this backdrop, our case presents a thorny question. Several of the MacDonald factors point towards finding exigent circumstances on these facts. The offense was indisputably

grave and violent – there was no reason to doubt that a large man assaulted a small woman with closed fists. There was probable cause to arrest Angel, as even plaintiffs concede. It was all but certain that Angel was in the house because the officers had seen him re-enter. And the officers' entry into the house, although non-consensual, was relatively peaceful; no force was used. On the other hand, two factors weigh against finding exigent circumstances: Angel was not a flight risk and there was no reasonable likelihood of weapons in the house.

Although more factors weigh towards, rather than against, finding exigent circumstances, applying the MacDonald factors is not a matter of simple arithmetic. Nor are the factors exhaustive. I must also look to how the Second Circuit applies these factors, and what else it considers when doing so.

From this perspective, an important throughline in the caselaw reveals itself. Loria, Tierney, and other emergency-aid cases all seemingly endorse a common background principle: for the emergency-aid exception to apply, there must be some ongoing emergency *within the home itself*, or at least one that can be stopped by the officers entering the home. Tierney rested heavily on the fact "that someone inside had been injured or was in danger" and "that both antagonists remained in the house." 133 F.3d at 197; see also Molina v. City of Elmira, 778 F. App'x 34, 37 (2d Cir. 2019) (responding to a call of a loud family dispute, police found a combative, drunk husband who continued to make escalating threats). Loria too focused on the potential emergencies, or rather the lack thereof, that the officers could have stopped by entering the plaintiff's home.

Although no controlling opinion has addressed the issue, the Second Circuit has held in a non-precedential summary order that an emergency "ends" for the purposes of the emergency-aid exception when a domestic dispute victim is safely outside of the house, and no one inside

the house is in further danger.  <u>Penree</u>, 694 F. App'x at 33.  Further, in cases where the issue was more squarely presented, other circuits have overwhelmingly held that the police can't rely only on a report of domestic violence to enter a house without a warrant; they also need an objectively reasonable basis for believing "that an *actual or imminent injury* was unfolding in the place to be entered." <u>Bonivert v. City of Clarkston</u>, 883 F.3d 865 (9th Cir. 2018); <u>see also</u> <u>Reed v. Campbell Cnty.</u>, 80 F.4th 734 (6th Cir. 2023); <u>Pleasants v. Town of Louisa</u>, 524 F. App'x 891 (4th Cir. 2013); <u>Storey v. Taylor</u>, 696 F.3d 987 (10th Cir. 2012); <u>Smith v. Kansas City Police Dep't</u>, 586 F.3d 576 (8th Cir. 2009).[1]

This is fatal to our defendants' argument.  A reasonable jury could not find that the individual defendants had to enter plaintiffs' house to stop ongoing violence or to prevent imminent violence.  When the officers arrived, Mayra was safely outside the house, promising them that she was willing to leave the premises.  She told the officers that Angel had returned only to retrieve clothes before leaving, and there was no reason for the officers to believe that was untrue – she had no new visible injuries, and there were no reports of additional fights.  The officers also had no reason to suspect that Angel posed a threat to the Crespo daughters.  In other words, "there was no emergency."  <u>Penree</u>, 694 F. App'x at 33.

Defendants repeatedly point out that there was a looming threat of violence.  If they did not enter the house, they insist, Angel could have attacked Mayra again at any time.  This is a non-sequitur.  Of course, if all the officers left the property, Mayra and maybe even her daughters would have been in danger.  Then, there may have been an emergency.  But the choice

---

[1] Even the California state cases on which defendants rely follow this principle.  <u>See</u> <u>People v. Frye</u>, 18 Cal. 4th 894, 959 P.2d 183 (1998); <u>People v. Higgins</u>, 31 Cal. Rptr. 2d 516 (Cal. Ct. App. 1994).  Both held that police officers, when responding to reports of domestic violence in a home, may seek refuge in the emergency-aid exception because "the officers [have] no right to detain [the victim] while seeking a warrant." <u>Higgins</u>, 31 Cal. Rptr. 2d at 519; <u>see also</u> <u>Frye</u>, 959 P.2d at 235.  But that logic holds only when both participants are inside the house, as was the case in both <u>Higgins</u> and <u>Frye</u>.  If a victim has left the home, the police do not "detain" the victim by waiting outside until a warrant is secured.

between entering the premises and leaving them entirely is not binary.  Some officers could have waited at the house, while others secured a warrant.  Doing so would not have "detained" Mayra or subjected her to any further danger like in <u>Tierney</u>, <u>Molina</u>, <u>Higgins</u> and <u>Frye</u>.  Accordingly, the emergency-aid exception to the warrant requirement does not excuse the warrantless entry into the Crespo home under state or federal law.

**Clearly Established.**   Yet the officers are nevertheless entitled to qualified immunity because plaintiffs' rights were not clearly established.  The "clearly established" requirement protects objectively reasonable reliance on existing law.  <u>See</u> <u>Lore v. City of Syracuse</u>, 670 F.3d 127, 166 (2d Cir. 2012).  An officer's conduct is objectively reasonable when "officers of reasonable competence could disagree on [its] legality."  <u>Edwards ex rel. Edwards v. City of New York</u>, No. 15-cv-3637, 2019 WL 3456840 at *5 (S.D.N.Y. July 31, 2019) (quoting <u>Dancy v. McGinley</u>, 843 F.3d 93 (2d Cir. 2016)).  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198 (2004) (per curiam) (cleaned up).

As evidenced by the lengthy path the Court travelled in determining that the emergency-aid exception did not apply, the underlying law is far from clearly established.  A competent officer in the individual defendants' position certainly could have arrived at the opposite conclusion: plaintiffs point to no controlling cases establishing when an emergency ends for the purposes of the emergency-aid exception; many of the <u>MacDonald</u> factors point towards finding exigent circumstances here; and the Second Circuit has repeatedly emphasized the "great latitude" that courts must afford to officers responding to reports of domestic violence.  <u>Tierney</u>, 133 F.3d at 197.  No reasonable jury could conclude that it would be beyond the pale for

reasonable police officers to disagree among themselves whether the potential risk of future violence justified their entering the home.

Plaintiffs attempt to stave off this inexorable conclusion by reference to <u>Penree</u> which, in their view, clearly establishes that an emergency ceases once police arrive and ensure that a domestic-violence victim is outside the house. <u>Penree</u>, however, is a summary order, and the Second Circuit has cautioned against relying on summary orders for qualified-immunity purposes because they "do not set out the factual background of the case in enough detail to disclose whether its facts are sufficiently similar to those of a subsequent unrelated case." <u>Jackler v. Byrne</u>, 658 F.3d 225, 244 (2d Cir. 2011). At best, a district court might rely on legal statements within summary orders, which "provide particularly good evidence of what legal principles the Second Circuit considers as established at any given point in time." <u>Bell v. Luna</u>, 856 F. Supp. 2d 388, 401 n.3 (D. Conn. 2012).

Yet no legal statement in <u>Penree</u> is of use to plaintiffs. The Court generally pronounced that "the emergency aid doctrine does not apply [when] there was no emergency," <u>Penree</u>, 694 F. App'x at 33, but it did not explain *when* an emergency ends in the domestic-dispute context. Moreover, even if an officer closely read the summary order and lower court's recitation of the facts in <u>Penree</u>, the officer might still conclude that there are material differences between the case and the situation confronting the officers here – for one, the victim there did not live in the same home as the alleged abuser.

In short, the responding officers were far from "plainly incompetent" in concluding that they needed to enter plaintiffs' home to protect Mayra from further harm. <u>Mullenix v. Luna</u>, 577 U.S. 7, 12 (2015) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)). They made a reasoned, good-faith judgment that happened to diverge from this Court's assessment of a very "hazy legal

backdrop." Id. at 14.  It ill-behooves courts, sitting in the peace and quiet of chambers, to second-guess police officers' on-the-spot call as to whether exigent circumstances exist.  An error by police can result in a severe injury or cost a life.  That is why courts "accord[] great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." Tierney, 133 F.3d at 197.  The individual defendants are due that latitude here.

      B.  False Arrest

      I turn next to plaintiffs' false-arrest claim, which derives from their unlawful-entry claim. Conceding that there was probable cause to arrest Angel, plaintiffs zero in on the arrests of Jennifer and Amy.  In their view, because the individual defendants entered the house unlawfully, the officers' conduct inside the house was not authorized.  Thus, plaintiffs conclude, there was no probable cause to arrest Jennifer and Amy for obstruction of justice or resisting arrest, both of which require proof that the arresting officers were engaged in lawful conduct.

      Plaintiffs are only half right.  True, "a defendant may not be convicted of obstructing governmental administration or interfering with an officer in the performance of an official function unless it is established that the police were engaged in authorized conduct."  People v. Sumter, 151 A.D.3d 556, 557, 58 N.Y.S.3d 304 (1st Dep't 2017).  The same goes for resisting arrest.  See N.Y. Penal Law § 205.30.  But an officer has probable cause to arrest a suspect whenever they have "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  Lennon v. Miller, 66 F.3d 416, 424 (2d Cir. 1995).  Whether the elements of the crime are in fact satisfied is irrelevant.

What matters, then, is not whether the individual defendants were lawfully present in the house, but rather *whether they had an objectively reasonable belief* that they were lawfully present in the house. And as discussed above, although the officers were not lawfully present in the house, it was reasonable to believe that they were. Competent officers could conclude that the warrantless entry was justified. There was thus at least reasonably trustworthy information sufficient to warrant the conclusion that Jennifer and Amy were obstructing a lawful arrest, and defendants are entitled to summary judgment on the false-arrest claim.

      C.  <u>Excessive Force</u>

The undisputed record similarly compels the conclusion that defendants are entitled to summary judgment on the excessive force claim. Force is excessive when it is unreasonable. <u>See</u> <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989). Whether force is unreasonable turns on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." <u>Id.</u> at 396. "Courts may decide excessive force claims . . . on motions for summary judgment." <u>Usavage v. Port Auth. of N.Y. & N.J.</u>, 932 F. Supp. 2d 575, 593 (S.D.N.Y. 2013).

The body-cam footage leaves no doubt that the officers used reasonable, proportionate force when arresting plaintiffs. No reasonable jury could watch the footage and conclude that the officers instigated this fight or that they wanted to somehow punish Angel for not cooperating. The entire interchange was set off by Angel's refusal to submit to arrest, his attempt to fight one of the officers, and his daughters' attempts to block the police from arresting him. Each instance of physical contact that ensued was a measured attempt to effectuate Angel's arrest. Even the repeated use of the taser was reasonable – several courts have held that

13

deploying a taser, on stun mode, against a suspect resisting arrest does not offend the Fourth Amendment.  See, e.g., Vasquez v. Warren, 630 F. Supp. 3d 524 (S.D.N.Y. 2022).  The altercation inside the Crespo's house was certainly violent, but the undisputed record leaves no question that the officers acted prudently.

### D.  Malicious Prosecution; Fair Trial; Failure to Intervene

Plaintiffs final three federal claims fall the quickest.  Take first the malicious-prosecution and fair-trial claims.  Plaintiffs pled near-identical theories for both: that the individual defendants fabricated Jennifer and Amy's arrest reports to establish probable cause.  However, at the summary judgment stage, they must do more than simply assert that defendants "created false evidence" and "forwarded false evidence to prosecutors."  Culpepper v. City of New York, No. 14-cv-6585, 2016 WL 5334978, at *6 (S.D.N.Y. Sept. 21, 2016); see also Ricciuti v. N.Y. City Tr. Auth., 124 F3d 123, 130 (2d Cir. 1997).  They must provide some "detail regarding the nature of the false evidence or the manner in which it was forwarded" to the prosecutors.  Culpepper, 2016 WL 5334978.

Plaintiffs have not done so.  Their Rule 56.1 statement merely states that "Police Officers Laurene Bove and Zachary Cullen drew up paperwork to support the charges against Jennifer and Amy and forwarded that paperwork to prosecutors to initiate the prosecution of Jennifer and Amy."  It does not say what parts of the paperwork was fabricated, other than the ultimate legal conclusion that probable cause existed.  Plaintiffs don't, for example, accuse defendants of including false facts in the report or of withholding exculpatory facts.  See Shabazz v. Kailer, 201 F. Supp. 3d 386, 394 (S.D.N.Y. 2016).  Defendants are accordingly entitled to summary judgment on these claims too.

Finally, plaintiffs also cannot prevail on their failure-to-intervene claim. "A law enforcement officer has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers." O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988). "An officer may be held liable for preventable harm caused by the actions of other officers, if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." Jackson v. City of New York, 939 F. Supp. 2d 219, 231-32 (E.D.N.Y. 2013) (cleaned up).

There is only one constitutional violation here – the unlawful entry. Yet, for the same reasons the individual defendants are entitled to qualified immunity on the unlawful-entry claim, they were not obligated to intervene. If reasonable officers could disagree as to whether the entry was unlawful, they obviously could disagree as to whether plaintiffs' Fourth Amendment rights were violated. Plaintiffs therefore cannot, as a matter of law, establish the second element of the claim.

## II.    State Claims

 All that remains of the case now are the state-law claims. The Court has supplemental jurisdiction over these claims, but it can "decline to exercise" jurisdiction because it dismissed "all claims over which it has original jurisdiction." 28 U.S.C. § 1367. Four considerations guide courts' discretion in determining whether to decline jurisdiction: "judicial economy, convenience, fairness, and comity." Jones v. Ford Motor Credit Co., 358 F.3d 205, 214 (2d Cir. 2004) (citing United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966)). With this in mind, "courts regularly dismiss state-law claims once a motion for summary judgment

disposes of all federal claims." Muslim v. Sagamore Children's Psychiatric Ctr., No. 22-cv-07850, 2024 WL 3431959, at *12 (E.D.N.Y. July 15, 2024).

I see no reason to depart from that practice here. Primarily, the remaining claims present novel issues of state law not so "easily resolvable" that it would be simpler to "resolve the case than decline to exercise jurisdiction." UBS Secs. LLC v. Dondero, No. 23-cv-1965, 2023 WL 8472322, at *8 (S.D.N.Y. Dec. 7, 2023). Because a plaintiff has an implied right of action for New York state constitutional violations only when there is no adequate alternative remedy under federal law or New York common law, the Court would need to carefully review whether each asserted state constitutional right is coextensive with its correlative federal constitutional right or otherwise remediated by state common law. See Lyles v. State, 2 A.D.3d 694, 770 N.Y.S.2d 81 (2nd Dep't 2003), aff'd Lyles v. State, 3 N.Y.3d 396, 398, 787 N.Y.S.2d 216 (2004). Judicial economy concerns, then, counsel towards dismissal.

The other factors point the same way. Whenever original-jurisdiction claims are dismissed, leaving only supplemental-jurisdiction claims, the principles of comity "strongly dictate that those claims should be heard in state court." Weiner v. McKeefery, 90 F. Supp. 3d 17, 45 (E.D.N.Y. 2015); see also Norton v. Town of Brookhaven, 2023 WL 3477123, at *4 (2d Cir. May 16, 2023). And when dismissal occurs at the summary-judgment stage, so too do the convenience and fairness factors. See Travelers Ins. Co. v. Keeling, 996 F.2d 1485 (2d Cir. 1993). I thus decline to exercise jurisdiction.

**CONCLUSION**

Defendants' motion for summary judgment is granted on plaintiffs' § 1983 claims. I decline to exercise supplemental jurisdiction over the state law claims, and they are dismissed without prejudice.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
       May 6, 2025

17